UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JOYCE HILLIARD, et al., | |
| Plaintiffs, | No. 17 CV 1043 |
| v. | Judge Manish S. Shah |
| HARDIN HOUSE INC., et al., | |
| Defendants. | |

ORDER

Defendants' motions to dismiss, [38]; [54], are granted. Relators' Second Amended Complaint, [26], is dismissed with prejudice. Enter judgment and terminate civil case.

STATEMENT

Relators Joyce Hilliard, Shawn Williams, Carla Scott, and Andrea Wilson were each employed in different capacities by defendants Hardin House Inc. and Drexel Counseling Services. [26] ¶ 7.[1] Defendant Kathy Hardin owns both Hardin House and Drexel. [26] ¶ 12. Hardin House and Drexel's staff include counselors and therapists that provide inpatient and outpatient mental-health and substance-abuse services. [29] ¶¶ 10, 19.

Although both Hardin House and Drexel purport to determine their clients' unique needs, [26] ¶ 21, they test every client for many different substances. [26] ¶¶ 33, 34, 82. For example, a client that comes in seeking treatment for alcoholism is tested for drugs that are normally injected (as well as other drugs). [26] ¶ 34. Part of the reason for this is that Quest trained Hardin House's and Drexel's employees to enter computer codes into their billing system in a way that resulted in each client being tested for every substance it was possible to test for. [26] ¶ 35. As a result, Hardin House and Drexel bill for a lot of testing, [26] ¶ 36, and many of those bills are submitted to Medicare and Medicaid. [26] ¶ 38, 71. When submitting their invoices, defendants—all of them, according to the Second Amended Complaint—

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the Second Amended Complaint. [26].

intentionally and knowingly certify that the drug analyses were reasonable and necessary. [26] ¶¶ 39, 40.

Hardin House, Drexel, Quest and Ms. Hardin have all moved to dismiss the complaint, which alleges that they violated (and conspired to violate) the False Claims Act and the Illinois False Claims Act. [26] at 6–17 (citing 31 U.S.C § 3729(a)(1)(A)–(C); 740 Ill. Comp. Stat. Ann. 175/3(a)(1)(A)–(C)). The False Claims Act imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(1)(A), (B). Relators in False Claims Act cases must allege "(1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 778 (7th Cir. 2016).

Complaints in False Claims Act cases are subject to the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure—they must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018); *Hanna*, 834 F.3d at 779; *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 777–76 (7th Cir. 2016). Normally, in order to meet that standard, the complaint must at least allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *Hanna*, 834 F.3d at 779 (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). *See also U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014) (the complaint must include the "identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated"). But what constitutes particularity depends on the facts of the case and the test must not be applied in an overly rigid way. *Berkowitz*, 896 F.3d at 839; *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011). Relators should "use some means of injecting precision and some measure of substantiation into their allegations." *Presser*, 836 F.3d at 776, 778 (cleaned up).

Unlike pleadings under Federal Rule of Civil Procedure Rule 8, "the pleader is not free to hold back and add facts via affidavit or brief," so the allegations must be evaluated based only on what is alleged in (or attached to) the complaint. *Hanna*, 834 F.3d at 779. *See also* [60] at 8; *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) (part of the purpose of Rule 9(b) is to "force the relator to do more than the usual investigation before filing his complaint"). As a result, I decline to consider the declaration of Joyce Hilliard, [60-2], and what purports to be a urine testing policy

issued by Quest, [60-1], neither of which were attached to the Second Amended Complaint.

Looking only at the face of the Second Amended Complaint, relators' claims do not include sufficient specificity to satisfy Rule 9(b). With regard to Kathy Hardin, the Second Amended Complaint makes no mention of her involvement beyond the allegation that she owned some of the entities at issue. Those entities employed counselors and therapists that provided many different services to many different types of patients. Unlike in *Presser*, where there were allegations that the higher-ups wrote emails demanding compliance with the policies in question and had access to video cameras that allowed them to monitor how treatment was being provided, *Presser*, 836 F.3d at 774, the Second Amended Complaint does not allege any specific factual circumstances that make it plausible that Ms. Hardin knew about, or directed the implementation of, the polices at issue here. *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) ("because fair notice is the most basic consideration underlying Rule 9(b), in a case involving multiple defendants, the complaint should inform each defendant of the nature of [her] alleged participation in the fraud") (cleaned up). The False Claims Act claim against Ms. Hardin and the claim that Ms. Hardin conspired to violate the False Claims act are both dismissed.

The claims against Hardin House and Drexel fail, too. With regard to when the alleged fraud took place, the Second Amended Complaint only narrows the window to a nine-year period reaching back to "at least 2011." [26] ¶ 15. It also fails to identify any particular person that may have submitted false or fraudulent claims. *See Grenadyor*, 772 F.3d at 1107. It even fails to nail down the location where the statements were made. *See* [26] ¶¶ 10, 18, 29 (Hardin House and Drexel apparently operate multiple facilities, but the Second Amended Complaint does not specify from which facility or facilities false requests for treatment were submitted). Even though it gives a general idea of what relators say happened—Hardin House and Drexel submitted bills to federal medical programs for tests that were unnecessary in light of clients' unique medical needs—the Second Amended Complaint does not identify any of the individual clients (even by pseudonym), any of the employees that submitted the tests, or any particular test that was unnecessary. It does not state with specificity the circumstances of the alleged fraud. *See also U.S. ex rel. Garst v. Lockheed-Martin Corp.,* 328 F.3d 374, 378 (7th Cir. 2003) (contending that the entirety of a claim is false "fails the requirement of specificity").

Nor does the Second Amended Complaint adequately allege a reason to believe that any pertinent regulations were knowingly violated. According to the regulations cited, defendants were required to occasionally conduct randomized testing "in accordance with generally accepted clinical practice," *see* [26] ¶ 24, and were prohibited from submitting bills for laboratory tests that were not "reasonable and necessary for the diagnosis or treatment of illnesses." [26] ¶ 47. But the Second

Amended Complaint contains "no medical, technical, or scientific context which would enable a reader of the complaint to understand why [defendants'] alleged actions amount to unnecessary care forbidden by the statute." *Presser,* 836 F.3d at 779. There may be reason to believe that people who have problems with one substance never (or at least very rarely) need to be tested for other substances but, if so, the context that would support such reasoning was not included in the Second Amended Complaint. In other words, the Second Amended Complaint does not "inject[] precision and some measure of substantiation" into the allegation that it was not in accordance with generally accepted clinical practice (or that it was not medically necessary) to test every patient for every substance.

The Second Amended Complaint also does not present circumstances that justify relaxing the pleading standards enough to forgive its generalities. Relators may make allegations "on information and belief" if the "facts constituting the fraud are not accessible" to them and they nonetheless "provide[s] the grounds for [their] suspicions." *Berkowitz*, 896 F.3d at 841. For instance, Rule 9(b) can be relaxed when the relator lacks access to the necessary facts because he or she was denied access to that information during discovery, *Corley v. Rosewood Care Ctr., Inc.,* 142 F.3d 1041, 1051 (7th Cir. 1998), or because the relator never had regular access to the medical bills he or she needed to prove the claim. *Presser*, 836 F.3d at 778. But relators' attempts to draw comparisons to those cases are unconvincing. In *Corley*, the complaint included detailed allegations of a bait-and-switch scheme that had been instituted by a nursing home against relator's mother and relator needed the additional discovery only to prove that the same scheme had been carried out against others. *Corley*, 142 F.3d at 1050–51. No such level of detail appears with regard to any patient in the Second Amended Complaint. And unlike in *Presser*, the Second Amended Complaint does not explain what the relators did while they were working at Hardin House and Drexel, or whether they might have had regular access to the information they need to plead the circumstances of the fraud with particularity. *See* [26] ¶ [7]. Each relator was employed "in different capacities at certain relevant times," *id.*, but that is insufficient to show that the relators were denied regular access to the facts they now say they cannot proceed without.

Satisfying Rule 9(b) does not require that relators violate the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Pub. L. No. 104–191,110 Stat. 1936 (1996). Only some information is subject to protection under HIPAA, *see* 45 C.F.R. § 160.103 (HIPAA protects information "(i) [t]hat identifies the individual; or (ii) with respect to which there is a reasonable basis to believe the information can be used to identify the individual"), and relators have made no showing that there is some specific, identifiable information that is necessary to satisfy Rule 9(b) that is protected under HIPAA. [65] at 5–6. They mention no particular documents and no particular information, and in any event do not even argue that such documentation and information are the only source of that information. This is insufficient,

4

especially considering that relators do not need to "present, or even include allegations about, a specific document or bill that the defendants submitted to the Government," *Presser*, 836 F.3d at 777, and may use pseudonyms to protect identities as necessary. *See id.* at 774 (the nurse provided examples of treatment that was given to certain patients referred to as "John Doe 1 and Jane Doe 2").

The Second Amended Complaint fares no better with regard to Quest. It does not identify the dates that Quest conducted any of their trainings nor any particular Quest employees that were involved in the training process. [26] ¶¶ 35–36. It also lacks specificity with regard to how Quest's training caused false claims to be made. For instance, the Second Amended Complaint does not describe whether the billing policy at issue was initiated by Quest (at which point, perhaps, Hardin House and Drexel first realized the potential gain to be had from the scheme and thereafter willingly went along with it) or whether Hardin House and Drexel requested that Quest train them to bill this way. (This lack of specificity is part of what dooms their conspiracy claim, too.) It also does not describe who entered the billing codes, whether the people that entered the billing codes had been instructed to do so by doctors or other medical professionals, or whether any doctors or medical professionals reviewed the billing codes before the tests were performed. Relators do not have to provide all of these details in their complaint, but they must plead their claims of fraud with more particularity than that which was included in the Second Amended Complaint.

In *Presser*, a nurse alleged that she had been instructed to continue using a billing code that applied to medical services that were no longer being provided, making the bills she submitted expressly false. *Presser*, 836 F.3d at 778. The alleged falsity in the Second Amended Complaint is that the testing was not medically necessary (or not up to clinical standards), not that it never occurred. *See* [26] ¶¶ 33, 34. And again, the Second Amended Complaint lacks the "medical, technical, or scientific context which would enable a reader of the complaint to understand why" the bills were false or misleading. *Presser,* 836 F.3d at 779. In any event, since the Second Amended Complaint fails to sufficiently allege that the bills submitted were false or misleading, Quest cannot be liable for causing defendants to submit those bills.

The Second Amended Complaint also fails to adequately allege a conspiracy. Although the Second Amended Complaint alleges that Quest trained employees at Hardin House and Drexel on how to enter the incorrect codes, it does not contain any allegations that make it plausible that Hardin House, Drexel, and Quest agreed to violate the False Claims Act (or any other statute). It simply asks the court to infer that, because there was a training that resulted in repeated violations, the parties must have agreed to violate the False Claims Act. *See* [26] ¶ 35. There is no allegation that the defendants met ahead of time to discuss (or at any time communicated) their mutual intent to obtain a false statement in order to procure payment from the

5

government. *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672–73 (2008) ("it must be shown that the conspirators had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim"). Nor are there any allegations about who made the agreement, when the agreement was made, or the terms of the agreement.

Defendants' motions to dismiss are granted. Relators' claims under the False Claims Act are dismissed, as are the claims that the defendants conspired to violate the False Claims Act. [26] ¶¶ 44–67. Without federal claims pending, I decline to exercise jurisdiction over relators' remaining state law claims. *See Domanus v. Locke Lord LLP*, 847 F.3d 469, 483 (7th Cir. 2017) ("[t]ypically, when a case is dismissed under Rule 12(b)(6), the district court will relinquish jurisdiction over [state law] claims and allow the state courts … to take over if that is proper under their rules"); 28 U.S.C. § 1367(c)(3).

Ordinarily, leave to amend should be given after granting a motion to dismiss the original complaint filed in a case. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015). Here, Ms. Hilliard's declaration provides additional detail relevant to her ability to access information before filing suit, *id.* [60-2] ¶ 5 (she was a manager), the time at which the billing practices began, *id.* ¶¶ 9, 10, 12–18 (she says it was right after Quest installed new software on their computers), and the reason that Hardin House and Drexel ordered the tests. ¶¶ 18–23 (the software made it impossible to request anything other than a full battery of tests). This additional detail could inject some "precision and … substantiation," *Presser*, 836 F.3d at 776, into some aspects of a new complaint, but Ms. Hilliard's declaration provides none of the "medical, technical, or scientific context" that might explain why it was unnecessary to test every patient for every substance. *Presser*, 836 F.3d at 779. In that regard, amendment would be futile because plaintiffs have failed to provide that context despite being given four opportunities (their three previous complaints and the response to the motion to dismiss) to do so. Medical necessity is the crux of the allegation of falsity, and after several attempts, relators have not articulated a plausible, particular claim on that front.

Part of the purpose behind requiring that sufficient facts be included in the original complaint in actions alleging fraud is to "force the relator to do more than the usual" pre-filing investigation. *Hanna,* 834 F.3d at 779; *Ackerman*, 172 F.3d at 469. Almost three years have passed since the complaint was filed, *see* [7], and nearly a year and a half has passed since both the United States and the State of Illinois declined to intervene. [12]; [16]. Nothing in Ms. Hilliard's declaration explains why

she could not have included the facts she now presents in any of the three complaints that relators have already filed.

      Ms. Hilliard's declaration, [60-2], and Quest's policy, [60-1], are too little, too late. All of the federal claims are dismissed with prejudice. The state-law claims are dismissed without prejudice for lack of jurisdiction. *Domanus*, 847 F.3d at 483; 28 U.S.C. § 1367(c)(3). Enter judgment and terminate civil case.

ENTER:

Date: January 22, 2020

Manish S. Shah
U.S. District Judge